UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────

ROSALIA DUENO,

        Plaintiff,

  -vs-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

        Defendant.

**DECISION and ORDER
No. 1:15-cv-01042(MAT)**

─────────────────────────────────

## INTRODUCTION

Represented by counsel, Rosalia Dueno ("Plaintiff") instituted this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Acting Commissioner of Social Security ("the Commissioner")[1] denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

## PROCEDURAL STATUS

### I.   Administrative Proceedings Prior Appeals Council Remand

Plaintiff protectively filed applications for DIB and SSI on December 16, 2009, alleging a disability onset date of January 20,

---

[1]
    Nancy A. Berryhill became the Acting Commissioner of Social Security on January 20, 2017. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted, therefore, for Acting Commissioner Carolyn W. Colvin as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2008. Her claim was initially denied April 9, 2010. On May 7, 2010, Plaintiff filed a timely written request for hearing, and on July 21, 2011, the first hearing was conducted via videoconference by Administrative Law Judge MaryJoan McNamara ("ALJ McNamara"). Plaintiff appeared with her attorney in Buffalo, New York, and testified via videoconference. (T.150-87).[2] ALJ McNamara indicated at the start of the hearing that she would like to have a supplemental hearing because Plaintiff had recently undergone surgery on June 24, 2011, and, ALJ McNamara explained, "[a]t this point we really don't know if she's permanently disabled or not because of the surgery." (T.154). ALJ McNamara determined that she would give Plaintiff three months to recuperate before holding the next hearing. (T.183-85).

During the interim, Plaintiff hired a new attorney, who is currently representing her on this appeal. ALJ McNamara conducted the second hearing via videoconference on March 26, 2012, at which Plaintiff appeared with her representative in Buffalo, New York, and testified. Impartial vocational expert George J. Starosta ("the VE") also testified at the hearing. On May 10, 2012, ALJ McNamara rendered a partially favorable decision, awarding DIB and SSI benefits to Plaintiff for a closed period from January 20, 2008, through September 12, 2011. (T.223-47). ALJ McNamara found that

---

[2]
    Citations to "T." in parentheses refer to pages in the certified administrative transcript.

Plaintiff's RFC for this period to be light work with only occasional climbing of ramps and stairs; occasional balancing, stooping, crouching, pushing and pulling; frequent kneeling and crawling; a sit/stand at will option; and allowance for being off-task more than two or more days per month, "most likely due to interfering pain or other reasons." (T.231). However, ALJ McNamara found that beginning on September 13, 2011, Plaintiff was no longer disabled. Confusingly, the ALJ repeated the exact same RFC for the non-disability period. (T.237-38).[3]

Plaintiff then timely filed a request for review of the ALJ's decision with the Appeals Council on May 21, 2012. (T.383-86). Plaintiff asserted that ALJ McNamara's decision contained "significant errors of law regarding the period of September 12, 2011, and ongoing" which required "outright revers[al]" or remand for a new hearing. (T.384).

## II. The Appeals Council's Remand Order

The Appeals Council granted Plaintiff's request review and issued a remand order on December 12, 2013, vacating ALJ McNamara's May 10, 2012 decision and remanding the claim for further

---

[3]
It appears that ALJ McNamara may have made a scrivener's error in composing the decision. The Court has reviewed the hearing transcript and ALJ McNamara posed three hypotheticals to the VE. The third hypothetical reflects the RFC contained in her decision, to which the VE responded that such a person could not perform Plaintiff's past relevant work or any other work. The second hypothetical, however, omits only the element of being off-task more than two days per month due to pain. The VE responded that the second hypothetical person could perform Plaintiff's past relevant work of clothing sorter, as well as various other jobs previously identified in response to the first hypothetical. (See T.132-44).

proceedings. (T.249-52). The Appeals Council found the first ALJ's RFC assessment on which she based a finding of disability to be unsupported by substantial evidence. The remand order directed the ALJ to (1) obtain additional evidence, which may include consultative examinations and medical source statements, concerning Plaintiff's impairments of degenerative disc disease and any impairments resulting from the past motor vehicle accident ("MVA") to complete the administrative record; (2) "if necessary, obtain evidence from a medical expert regarding medical improvement" of Plaintiff's impairments of degenerative disc disease and any impairments resulting from the past MVA, including "clarification regarding any inconsistencies in the medical record"; (3) give further consideration to Plaintiff's maximum residual functional capacity ("RFC") and provide an appropriate rationale with specific references to evidence of record in support of the assessed limitations; and, (4) if warranted by the expanded record, obtain supplemental evidence from a VE to clarify the effect of the assessed limitations on the occupational base by posing hypothetical questions which reflect the specific capacity and limitations established by the record as a whole. (T.251).

## III. Administrative Proceedings on Remand

On July 15, 2014, a third hearing was conducted by Administrative Law Judge Donald T. McDougall ("ALJ McDougall") in Buffalo, New York, at which Plaintiff appeared with her attorney

and testified. (T.188-214). ALJ McDougall did not call any witnesses.

On July 23, 2014, ALJ McDougall rendered an unfavorable decision (T.44-71), finding that Plaintiff has not been under a disability, as defined in the Act, from January 20, 2008, through the date of the decision. (T.64). In particular, the second ALJ found that Plaintiff had the RFC to perform the full range of light work, without any non-exertional limitations.

Plaintiff filed a request for review of the ALJ's decision with the Appeals Council on July 23, 2014. Plaintiff also submitted records from two of her treatment providers. On November 27, 2015, the Appeals Council denied her request for review, making the ALJ's decision the final determination of the Commissioner. Plaintiff timely commenced this action.

## SCOPE OF REVIEW

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); see also Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be

conclusive"). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000) (quotation omitted). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." <u>Byam v. Barnhart</u>, 336 F.3d 172, 179 (2d Cir. 2003) (citing <u>Townley v. Heckler</u>, 748 F.2d 109, 112 (2d Cir. 1984)).

## DISCUSSION

## I.   Denial of a Fundamentally Fair Hearing on Remand Due to ALJ McDougall's Bias

Plaintiff argues that, on remand from the Appeals Council, ALJ McDougall demonstrated bias against her by failing to keep the record open for the full period of time he said he would at the hearing and by taking actions inconsistent with the Appeals Council's remand order.[4] The Commissioner argues that the failure to hold the record open was harmless because the records in

---

[4]

Plaintiff also argues that the second ALJ adversely judged Plaintiff's credibility for proceeding with back surgery with Dr. Andrew Cappuccino in June 2011, based on his erroneous assignment of greater weight to a radiologist's interpretation of imaging studies versus Dr. Cappuccino's assessment of the same studies and consequent decision to proceed to surgery. This argument, in sum and substance, is also made in support of Plaintiff's second contention that the second ALJ improperly substituted his lay judgment for competent medical opinion. The Court will consider it in the discussion of the second contention, as it is more properly made in that context.

question ultimately were not submitted until well after issuance of the second decision. The Commissioner further argues that the remainder of actions with which Plaintiff takes issue are legal rulings that generally do not give rise to an inference of bias.

"It cannot be disputed that litigants seeking Social Security benefits are entitled to have a fair and impartial decision-maker. Indeed, a basic element of due process is the right to an impartial and unbiased adjudication of a claim." Pronti v. Barnhart, 339 F. Supp.2d 480, 491–92 (W.D.N.Y. 2004) (citing Johnson v. Mississippi, 403 U.S. 212, 216 (1971)). "This aspect of due process applies equally in an administrative setting as it does in a judicial forum." Kendrick v. Sullivan, 784 F. Supp. 94, 102 (S.D.N.Y. 1992) (citing Schweiker v. McClure, 456 U.S. 188, 195 (1982)). "When an ALJ confronts a claimant with a negative bias and without impartiality, he undermines the essentially judicial nature of an ALJ's duties." Poles v. Colvin, No. 14-CV-06622 MAT, 2015 WL 6024400, at *2 (W.D.N.Y. Oct. 15, 2015) (citing Peed, 778 F. Supp. at 1245). More broadly, "a ALJ does not face a claimant such as [Plaintiff] in an adversarial posture[,]" Peed v. Sullivan, 778 F. Supp. 1241, 1245 (E.D.N.Y. 1991), but "has a duty to ensure that the claimant receives 'a full hearing under the [Commissioner]'s regulations and in accordance with the beneficent purpose of the Act.'" Id. (quoting Gold v. Sec'y of Health, Educ., and Welfare, 463 F.2d 38, 43 (2d Cir. 1972); citation omitted).

## 1. Premature Closure of the Record

At the remand hearing on July 15, 2014, ALJ McDougall stated that he would leave the record open for 14 days in order for Plaintiff's attorney to obtain the office notes from treating pain management specialist Dr. Amrit Singh. However, the ALJ closed the record after 7 days and issued his fully unfavorable decision on July 23, 2014, (T.47), and offered no explanation as to why he closed the record prior to 14 days.

However, the Court cannot deem this procedural irregularity to be harmless, since in weighing Dr. Singh's opinions, the ALJ discounted them as being unsupported by "objective evidence." The office treatment notes from Dr. Singh that are in the record contain detailed clinical findings, which suggests that any missing records would be similarly supported.

## 2. Exceeding Scope of Appeals Council's Remand Order

Plaintiff contends that ALJ McDougall impermissibly exceeded the scope of the Appeals Council's remand order. The Commissioner's regulations provide that, upon remand, an ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. §§ 404.977(b), 416.1477(b). "Accordingly, reviewing courts have found that failure to comply with the Appeals Council's remand order may be grounds for remand." Dommes v. Colvin, 225 F. Supp.3d 113, 118 (N.D.N.Y. 2016) (citing

<u>Mortise v. Astrue</u>, 08-CV-0990, 713 F. Supp.2d 111, 120-24 (N.D.N.Y. 2010) (remanding based on the ALJ's failure to comply with the Appeals Council's remand order to follow the treating physician rule); other citation omitted)).

Plaintiff characterizes the Appeals Council's directive as remanding the claim because ALJ McNamara, the first ALJ, did not adequately address the issue of Plaintiff's medical improvement *after* September 12, 2011. Plaintiff asserts the second ALJ overstepped his authority by focusing on the period *prior* to September 13, 2011, and rejecting the first ALJ's RFC assessment for the closed period of disability. However, contrary to Plaintiff's contention, the Appeals Council *did* dispute the first ALJ's RFC for light exertion work with several additional limitations, stating that

> the decision does not contain sufficient rationale with
> specific references to evidence of record in support of
> the assessed limitations. Specifically, the [first ALJ]
> uses x-ray and MRI findings that reveal essentially
> normal to mild abnormalities and refers to medical source
> opinions that the claimant can return to work to support
> a very restrictive RFC . . . .

(T.250). Thus, the Appeals Council found the first ALJ's RFC assessment on which she based a finding of disability to be unsupported by substantial evidence. (<u>See</u> <u>id.</u> ("grant[ing] request for review under the substantial evidence provision of the Social Security Administration regulations")). The Appeals Council vacated the entire first decision, and instructed the second ALJ to "[g]ive

further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations. . . ." (T.251). In other words, the manner in which the Appeals Council's order is worded does not indicate that any part of the first ALJ's decision remained as the "law of the case." Therefore, the Court cannot find that the second ALJ exceeded the scope of remand order.

## II. Erroneous Substitution of Lay Opinion for Competent Medical Expert Opinion (Plaintiff's Point II)

Plaintiff contends that the second ALJ arbitrarily substituted his own judgment as a lay person for the competent opinions submitted by multiple medical experts. As Plaintiff notes, "while an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (quoting McBrayer v. Sec'y of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983) (internal quotation marks and citations omitted in original)).

Plaintiff's brief cites foregoing line of cases, but her argument appears to be focused on the lack of medical expert opinion supporting the second ALJ's RFC assessment for light work without any non-exertional limitations. Specifically, Plaintiff contends that the second ALJ's RFC assessment does not align with

any of the competent opinions from medical experts in the record. The Commissioner counters that an ALJ's RFC finding need not need track any single medical opinion. See, e.g., Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (unpublished opn.) (although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, the ALJ was entitled to weigh all evidence available to make an RFC finding that was consistent with the record as a whole, which included four medical opinions).

The Commissioner argues that the second ALJ's RFC assessment for light work with no non-exertional limitations is not inconsistent with the report issued by consultative physician Donna Miller, D.O. on February 26, 2010. This is the opinion to which the second ALJ assigned the most weight. At that time, Dr. Miller observed that Plaintiff could squat 30 percent of normal out of fear of back pain; could heel-toe walk without difficulty; had limited lumbar spine range of motion ("ROM") (extension to 5 degrees, flexion to 45 degrees, lateral flexion to 20 degrees bilaterally, and lateral rotation to 20 degrees bilaterally); had limited cervical spine ROM (extension to 30 degrees, flexion to 45 degrees, lateral flexion to 30 degrees bilaterally, rotation to 40 degrees bilaterally); and limited ROM in the shoulders bilaterally due to neck pain. (T.824). For her medical source statement, Dr. Miller opined that Plaintiff had only "mild" limitations in bending, turning, twisting, lifting, and carrying.

(T.825). Dr. Miller did not mention any of the other major exertional demands, including sitting, standing, and walking. See SSR 96-9p, 1996 WL 374185, at *5 (S.S.A. July 2, 1996) ("Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining ability to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling.").

Dr. Miller examined Plaintiff a second time, after the Appeals Council remand. In her report dated March 19, 2014 (T.926-29), Dr. Miller's clinical observations and opinion diverged from her first report. On examination, Dr. Miller observed that Plaintiff could only squat to 25 percent of normal and had trouble walking on her heels; this represented a worsening from the prior examination. Plaintiff's lumbar spine ROM measurements were the same except her flexion was decreased to 35 degrees. Two of her cervical spine ROM measurements were the same but her flexion and rotation had both decreased to 30 degrees. Dr. Miller wrote that it was "questionable if [Plaintiff] was putting full effort" into the examination. (T.928). Nonetheless, Dr. Miller opined that Plaintiff has "moderate limitation for heavy lifting, carrying/bending, pushing, and pulling." (T.929). Dr. Miller expanded upon this opinion in a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" issued the same date. (T.930-35). In pertinent part, Dr. Miller indicated that Plaintiff can sit for 6 hours, stand for

4 hours, and walk for 4 hours in an 8-hour workday; can occasionally lift and/or carry up to 10 pounds, can never stoop, kneel, climb ladders or scaffolds, crouch, or crawl; can occasionally balance and climb stairs and ramps; can never operate foot controls with both feet; and can never push or pull with her hands. (T.930-33). Thus, in contrast to her 2010 medical source statement which was not inconsistent with the lifting and carrying demands of light work,[5] most of Dr. Miller's 2014 opinion did not support more than a sedentary RFC.

Even though the 2014 opinion included a detailed function-by-function physical RFC assessment, the ALJ discounted it in favor of the more remote 2010 opinion which was unaccompanied by a detailed function-by-function physical RFC assessment. Specifically, the ALJ determined that Dr. Miller's 2010 opinion should be given "great weight" because it was "consistent with her examination" of Plaintiff and consistent with Plaintiff's reported activities of cooking daily, cleaning twice a week, shopping twice a month, providing childcare daily, and performing personal care daily. (T.62). In contrast, the ALJ found that Dr. Miller's 2014 opinion should be "given some, but not great weight." (T.63). As reasons for discounting Dr. Miller's more recent opinion, the ALJ noted that Dr. Miller "questioned whether or not the claimant put forth

---

[5]    Dr. Miller's 2010 report is silent on, and thus ambiguous as to, the strength demands of sitting, standing, walking, pushing, and pulling.

full effort," which was "very significant to [him]." (T.63). However, Dr. Miller also noted, during the 2010 examination, that Plaintiff's ability to squat and her cervical ROM were decreased out of fear of back and neck pain. It is unclear why Dr. Miller attributed different motives to Plaintiff, but it is entirely plausible that what Dr. Miller perceived as "questionable effort" during the 2014 examination was due to Plaintiff's apprehension about exacerbating her pain. The ALJ made no attempt to obtain clarification on this point from Dr. Miller, which suggests that he was cherry-picking the evidence. "[W]hile administrative law judges are entitled to resolve conflicts in the evidentiary record, they cannot pick and choose only evidence that supports their particular conclusions." Tim v. Colvin, No. 6:12-CV-1761 GLS/ESH, 2014 WL 838080, at *7 (N.D.N.Y. Mar. 4, 2014) (citing Smith v. Bowen, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing Fiorello v. Heckler, 725 F.2d 174, 175–76 (2d Cir. 1983))).

The second ALJ also cited the purportedly "normal physical examinations since January 2012" as a reason for discrediting Dr. Miller's 2014 opinion. (T.63). This is a wholly inaccurate characterization of the record. For instance, on January 12, 2012, Plaintiff reported to her surgeon, Dr. Cappuccino, that over the past couple of months, her back pain "has been escalating in severity," especially when trying to return to neutral from a forward flexed position. (T.874). She was also having "difficult

time procuring restorative sleep" due to her pain. While there was no superficial tenderness on palpation, Dr. Cappuccino noted that her pain "does reside at the pelvic brim line in the center of the back" and she had "discomfort higher up in her mid back." (Id.). On February 10, 2012, Dr. Cappuccino completed a Medical Examination for Employability Assessment; he diagnosed "low back pain syndrome," recommended physical therapy and conservative care, and opined she was "moderately limited" in sitting, standing, walking, lifting, carrying, bending, pushing, pulling, and climbing stairs. (T.893-94). On February 13, 2012, nurse practitioner Veronica V. Mason, MSN-FNP-C examined Plaintiff and noted "straight-leg raises were positive with low back," there was paraspinal tenderness in the lower lumbar spine as well as mid-thoracic area tenderness, and tenderness with significantly decreased ROM in the cervical spine. (T.911). On July 26, 2012, Plaintiff returned to Dr. Cappuccino complaining of persistent mechanical back pain. The doctor believed Plaintiff's pain was secondary to incomplete incorporation of the prosthesis; he noted that it did not appear to have fully ingrown in the expected manner. (T.940). Dr. Cappuccino discerned "evidence of facet [joint] overload on plain radiographs" of her spine. On examination, Dr. Cappuccino noted multiple abnormal findings, including a "dense sensory parethesia," visual and palpable spasms in the lumbar spine, point tenderness over the midline lumbar spine and across the transiliac region, lumbar flexion that was "markedly

limited," and lumbar extension that was "even more [limited]." (T.940). Dr. Cappuccino commented that her EMGs were "positive for bilateral L5 radiculopathy." (Id.). X-rays of the lumbar spine taken on July 26, 2012, revealed incomplete fixation on both endplates and evidence of trace subsidence on the inferior endplate globally. (T.943).

Plaintiff returned to Dr. Cappuccino on May 9, 2013, with continuing mechanical back pain, though she had some improvement in her left lower extremity discomfort. Findings on clinical examination were improved over the July 2012 appointment. (T.937). Plain x-rays taken that day showed evidence of a "possible gap between the inferior and superior endplates where the bone/metal interface is located," but "gross failure" of the prosthesis was not identified. (T.939).

On May 28, 2014, Plaintiff's car was sideswiped by another car, which caused a subsequent increase in her lower back pain. (T.10). At her visit on June 3, 2014, Dr. Singh observed many abnormal clinical findings, including positive straight-leg raises in the supine position bilaterally (low back pain at 60 degrees on the right and at 65 degrees on the left), markedly limited lumbar extension, marked pain with straightening from a flexed position, mild unsteadiness with a positive Trendelenburg's sign on the right, increased pain in the lower back with the FABER test and hip rotation bilaterally, and tenderness at the mid- and lower-lumbar

spinous processes, the sacroiliac joints, and greater trochanters bilaterally. (T.987).

The records from Dr. Singh and Dr. Lewis submitted to the Appeals Council in 2015 likewise show continued complaints of back pain and abnormal examinations. Plaintiff returned to Dr. Singh on September 5, 2014, reporting that her pain had returned to the previous level. (T.10). She again had multiple abnormal clinical findings, as at the previous appointment. Dr. Singh recommended that she be evaluated by a neurosurgeon.

On October 5, 2014, Plaintiff saw Dr. Lewis for a neurosurgical consult, as Dr. Cappuccino no longer accepted her insurance. She reported significant lower back pain and intermittent leg pain. (T.12). Dr. Lewis observed "severe[ly] restricted" ROM of the lumbar spine on flexion and extension. (T.13). A lumbar spine MRI and a reconstruction CT scan of the lumbar spine were ordered; according to the radiologist, these showed mild reduction of the disc space at L5-S1 without evidence of central canal stenosis or foraminal narrowing. (T.15). On November 5, 2014, Dr. Lewis personally reviewed the CT and MRI scans, and he determined that there was a disc herniation at L4-L5, and that the posterior portion of the disc herniation had not been fully removed during the prior surgery. (T.17). Dr. Lewis concluded that the 2011 surgery had failed. (T.17). On examination, Plaintiff walked with a slow and caution gait, had some trouble getting up

from a seated position, and had diffuse low back pain. Dr. Lewis recommended corrective surgery to remove the artificial disc and to perform a fusion at L4-L5. (T.18).

Plaintiff returned to Dr. Singh on December 5, 2014, with complaints of sharp lower back pain radiating to her legs bilaterally. (T.8). Dr. Singh again noted multiple abnormal clinical findings on examination, unchanged from the previous appointments. He noted that Plaintiff's insurance company had denied Dr. Lewis' request for surgical authorization.

On April 30, 2015, Plaintiff underwent corrective back surgery with Dr. Lewis and Dr. Timothy R. Rasmusson. The procedure entailed explantation of the artificial disc at L4-L5 placed by the previous surgeon, Dr. Cappuccino, and performance of a lateral lumbar interbody fusion ("LLIF") at L4-L5. (T.23-25). On May 12, 2015, at a follow-up with Dr. Lewis, Plaintiff was doing "fairly well" but was still having back pain, muscle spasms, right psoas muscle weakness, and right lower extremity radiculopathy. (T.29). At another follow-up on July 7, 2015,[6] Dr. Lewis indicated that Plaintiff's pain level was "much less than it was before the surgery" although she had "some residual proximal thigh numbness and tingling," and some "tolerable" tenderness to palpation over the pedicle screw at L4 on the right. (T.33).

---

[6]
This is the most recent treatment note in the record.

Contrary to ALJ McDougall's assertion, the record up until the date of his decision on July 23, 2014, does not show "normal physical examinations since January 2012" with "only a few exacerbations" in Plaintiff's symptoms. These reasons for discounting Dr. Miller's 2014 opinion rely on a mischaracterization of the record and therefore are not supported by substantial evidence. The ALJ's further assertion that there is "little to no objective evidence to support the claimant's complaints," (T.53), also is a blatant mischaracterization of the record.

Relatedly, the Court finds that the ALJ erred in weighing the opinions from treating pain management specialist Dr. Singh and treating orthopedic surgeon Dr. Cappuccino. According to the treating physician rule of deference, the medical opinion of a claimant's treating physician or psychiatrist will be given "controlling" weight if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The rationale for according well-supported treating physicians' opinions controlling weight is that they "[a]re likely to be [from] the medical professionals most able to provide a detailed [and] longitudinal picture of [the claimant's] medical impairment(s). . . ." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Unless an ALJ gives controlling weight to a treating source opinion, he is

required to consider a number of factors in deciding the weight to be accorded to the treating source. 20 C.F.R. §§ 404.1527(c), 416.927(c). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Furthermore, "[a]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (citation omitted).

Here, the ALJ determined that he should not give Dr. Singh's opinions "controlling weight since [the doctor] did not provide any objective evidence as to the basis of his opinion." (T.60). The ALJ's requirement of "objective evidence" misapplies the regulations regarding the types of evidence with which a medical opinion should be supported. "'[M]edically acceptable clinical and laboratory diagnostic techniques' include consideration of '[a] patient's report of complaints, or history, [a]s an essential diagnostic tool.'" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (alterations in original) (quoting Green-Younger, 335 F.3d at 107 (further quotation omitted)). The Court finds that the second ALJ did not provide "good reasons" for declining to give Dr. Singh's controlling weight, which alone is a ground for reversal. See Beck v. Colvin, No. 6:13-CV-6014(MAT), 2014 WL 1837611, at *9 (W.D.N.Y. May 8, 2014) ("Because the 'good reasons'

rule exists to 'ensur[e] that each denied claimant receives fair process,' Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 243 (6th Cir. 2007), an ALJ's '"failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record."'") (quoting Blakely v. Comm'r of Soc. Sec., 581 F.3d 399, 407 (6th Cir. 2009) (quoting Rogers, 486 F.3d at 243; emphasis in Blakely)). Furthermore, the ALJ ignored the treatment notes from Dr. Singh consistently reporting abnormal clinical findings, such as lumbar ROM that is "decreased and painful," "marked pain with straightening from a flexed position," and positive straight-leg raise tests bilaterally. (E.g., T.987). The Court cannot conclude that the error was harmless, because Dr. Singh limited Plaintiff to no bending, no twisting, and no lifting more than 10 pounds.[7] However, the ALJ's RFC for light work without any non-exertional limitations ignores all of Dr. Singh's limitations.

---

[7]

Both light and sedentary jobs require a claimant to bend or stoop occasionally. See SSR 83-14, 1983 WL 31254, at *4 (S.S.A. 1983) ("[T]he frequent lifting or carrying of objects weighing up to 10 pounds (which is required for the full range of light work) implies that the worker is able to do occasional bending of the stooping type; i.e., for no more than one-third of the workday to bend the body downward and forward by bending the spine at the waist."); SSR 96-9p, 1996 WL 374185, at *8 (S.S.A. July 2, 1996) ("A *complete* inability to stoop would significantly erode the unskilled sedentary occupation base and a finding that the individual is disabled would usually apply . . . .") (emphasis in original).

The ALJ likewise erred in weighing Dr. Cappuccino's opinions and statements. Dr. Cappucinno began treating Plaintiff on November 8, 2010, for complaints of severe, intractable back pain. (T.835). Upon review of her lumbar x-rays, he noted significant lumbar list, paralumbar spasm, facet changes at L5-S1, and narrowing at L4-L5 and L5-S1. (T.835, 839). On examination, Dr. Cappuccino observed painful loss of motion on cervical flexion to 30 degrees, a positive Spurling's sign bilaterally, visual and palpable spasms on the trapezius bilaterally, point tenderness over the cervical prominence, proximal grade weakness of 4/5 in the deltoids and biceps, worse on the right; paraspinal discomfort with percussion over mid-thoracic spine, pain with protraction and retraction of the scapula, and lumbar flexion markedly limited to 45 degrees. (T.835-36). Dr. Cappuccino opined that Plaintiff was temporarily totally disabled from all work. (T.836). When Dr. Cappuccino saw Plaintiff on April 25, 2011, for complaints of worsening and near intractable axial lower back pain, he noted that the MRI showed evidence of disc dessication and decreased joint space height predominantly at L4-L5. (T.832). Based on his findings, Dr. Cappuccino indicated that Plaintiff was a "good candidate for lateral-based total disc replacement at L4-L5." (T.832). Throughout the treatment period, Dr. Cappuccino opined that Plaintiff remained temporarily and totally disabled from all forms of work. (E.g., T.836).  On February 1, 2012, Dr. Cappuccino prepared a Medical

Examination for Employability Assessment indicating that Plaintiff was "moderately limited" in walking, standing, sitting, lifting, carrying, pushing, pulling, bending, and climbing stairs. As noted above, Dr. Cappuccino examined Plaintiff in July of 2012, and discerned "evidence of facet [joint] overload on plain radiographs" of her spine and, on examination, noted multiple abnormal clinical findings. He continued to opine that she was disabled. On May 9, 2013, Dr. Cappuccino stated that Plaintiff had an "ongoing marked degree of disability" and "would benefit from [a] bone scan with special attention applied to the [lumbar spine] to rule out loss of fixation pertaining to her prosthesis." (T.937). Dr. Cappuccino commented that there were "not great options for her aside from ongoing pain management and living with her discomfort versus surgical revision/fusion." (T.937-38). According to the ALJ, Dr. Cappuccino's opinions and statements were "not giving controlling weight because they failed to show any change despite the improvement noted in her subjective complaints and physical examinations since the alleged onset date." (T.59). While there was some degree of improvement in her subjective complaints of pain after the first back surgery in June 2011, they were short-lived. On July 25, 2011, Plaintiff reported her pain was "significantly better" (T.864), but by September 12, 2011, she had complaints of back discomfort that had "not significantly changed in severity" as well as intermittent bilateral lower extremity paresthesia.

(T.877). Although she was ambulatory, she reported that "standing for long periods of time does seem to exacerbate her lower back complaints." (Id.). By the time of her January 12, 2012 visit with Dr. Cappuccino, Plaintiff reported that over the last couple of months, her back pain has been escalating in severity. (T.874). Dr. Cappuccino indicated that she remained totally disabled. Ultimately, as discussed above, Plaintiff underwent corrective back surgery because the 2011 surgery failed. The Court recognizes that a statement that a claimant is disabled, even if offered by a treating physician, is not entitled to special deference because it is an opinion on an issue reserved to the Commissioner. However, Dr. Cappuccino also delineated specific restrictions in his Medical Examination for Employability Assessment, namely, that Plaintiff "moderately limited" in walking, standing, sitting, lifting, carrying, pushing, pulling, bending, and climbing stairs. The second ALJ opined that this was consistent with her allegedly "relatively normal" physical examinations and her "ability to cook, clean, shop, provide childcare, perform personal care activities, and drive." (T.59). At the outset, as the Court has already discussed, the ALJ's assertion that Plaintiff's examinations were "relatively normal" is unsupported by the longitudinal treatment notes from all of Plaintiff's providers. Moreover, the remainder of the ALJ's reasoning is circular and glosses over two critical issues. First, it is unclear whether being "moderately limited" in

walking, standing, sitting, lifting, carrying, pushing, pulling, bending, and climbing stairs" supports an RFC for the full range of light work with no additional limitations, as the ALJ found. As discussed elsewhere in this decision, the ALJ erroneously failed to perform a function-by-function assessment prior to arriving at his RFC assessment. Second, it is not self-evident that the activities of daily living listed by the ALJ translate to the ability to perform the functional activities required for a full range of light work,[8] for 8 hours a day, 5 days a week, or an equivalent full-time schedule.

During the time period Plaintiff was seeing Dr. Cappuccino, she was also treating with chiropractor Dr. William M. Brierley. (T.883-92, 897). On December 11, 2009; February 10, 2010; December 18, 2011; and March 25, 2012, Dr. Brierley completed Medical Examination for Employability Assessments (T.550-51, 882-

---

[8] "The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs." SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983). "Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping." Id. at *6. "[T]he frequent lifting or carrying of objects weighing up to 10 pounds (which is required for the full range of light work) implies that the worker is able to do occasional bending of the stooping type; i.e., for no more than one-third of the workday to bend the body downward and forward by bending the spine at the waist." SSR 83-14, at *4 (S.S.A. 1983).

83, 826-27, 895-99). In December 2009, and February 2010, he opined that Plaintiff was "very limited" in sitting, standing, lifting, bending, pushing, and pulling, and "moderately limited" in walking and climbing stairs. (T.550, 881). On March 25, 2010, Dr. Brierley stated that Plaintiff cannot tolerate prolonged sitting due to pain. (T.828). In the December 2011 Medical Examination for Employability Assessment, Dr. Brierley indicated that Plaintiff was "very limited" in sitting, standing, lifting, bending, pushing, and pulling, as well as climbing stairs and "moderately limited" in walking. (T.826). On March 25, 2012, Dr. Brierley opined that Plaintiff cannot work a light or sedentary job, even if she were allowed to alternate sitting and standing. Dr. Brierley set forth functional limitations to support his opinion in the Physical Capacities Evaluation, namely, that Plaintiff was limited to 2 hours of sitting, 2 hours standing, and 2 hours of walking in an 8-hour workday,[9] and could never stoop.[10] Dr. Brierley also indicated that Plaintiff "could not tolerate prolonged postures (i.e., sitting)." The restriction against stooping is very significant since a complete inability to stoop would erode the

---

[9] "In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals. If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded." SSR 96-9p, 1996 WL 374185, at *6 (S.S.A. July 2, 1996) .

[10] "An ability to stoop occasionally; i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations." SSR 96-9p, 1996 WL 374185, at *8.

occupational base of all sedentary work, which ALJ McDougall recognized at the hearing. (T.211). As SSR 96-9p explains, "[a] *complete* inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply. . . ." SSR 96-9p, 1996 WL 374185, at *8 (emphasis in original).

The Court recognizes that Dr. Brierley's opinions are not entitled to the presumption of deference accorded to treating physician opinions, since chiropractors are not acceptable medical sources. Nevertheless, the Commissioner's policy ruling, SSR 06-03p, recognizes that information "other sources" "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006). Indeed, "[d]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source' . . . ." Id. Regardless of the source, the appropriate amount of weight to be afforded such evidence is determined by applying the same general criteria: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) evidence supporting the opinion; (4) consistency with the record as a whole; (5) the

source's specialization in the area of treatment; and (6) other significant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c); see also SSR 06-03p ("Although the[se] factors [ ] explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'"). Dr. Brierley had a fairly lengthy treating relationship with Plaintiff, and, as a chiropractor, had specialized knowledge of the back impairments on which Plaintiff premises her disability claim. The length and nature of the treatment relationship and specialization are two important factors in assessing the weight of all opinion evidence. Furthermore, Dr. Brierley's opinion was consistent with the opinion evidence provided by treating surgeon Dr. Cappuccino and treating pain management specialist Dr. Singh, as well as Dr. Miller's 2014 report, to the extent that Dr. Miller limited Plaintiff to less-than-light work and precluded her from stooping.

In sum, because ALJ McDougall's RFC of a full range of light work with no limitations throughout the entire period commencing January 20, 2008, relies on various mischaracterizations of the record, the Court cannot find it to be supported by substantial evidence.

## III. Failure by the Appeals Council to Consider the Newly Submitted Records (Plaintiff's Point III)

In her request for review to the Appeals Council following the second ALJ's decision, Plaintiff's attorney submitted records from

Dr. Singh (T.8-11) covering the period from September 5, 2014, to December 5, 2014; and records from Dr. Lewis (T.12-34) covering the period from October 5, 2014, to July 8, 2015. The Appeals Council rejected review, stating that these records were "new information . . . about a later time" and "does not affect the decision about whether you were disabled beginning on or before July 23, 2014." (T.2). Since the Court has found alternative bases for remanding Plaintiff's case, it need not resolve whether the Appeals Council erred in declining to consider the additional evidence. These treatment notes are now part of the record and have been considered by this Court.

## IV.     Failure to Perform a Function-by-Function Analysis of Plaintiff's Limitations (Plaintiff's Point IV)

Plaintiff contends that the ALJ failed to perform a function-by-function assessment of her functional limitations before formulating the RFC. As Plaintiff notes, SSR 96-8p directs that an "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis;" it is "[o]nly after that may RFC be expressed in terms of the exertional levels of work . . . ." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). This analysis requires assessing a claimant's ability "to perform each of seven strength demands: [s]itting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately[.]" Id. (quoting SSR 96-8p, 1996 WL 374184,

at *5). Here, the ALJ failed to make such a function-by-function finding. Nor did he mention any of the exertional requirements of light work. Cf. Ferguson v. Colvin, No. 1:12-CV-0033 MAT, 2014 WL 3894487, at *8 (W.D.N.Y. Aug. 8, 2014) (reversing based on failure to follow SSR 96-8p's instruction to perform a function-by-function analysis; even though the ALJ mentioned the lifting requirements of light work, and acknowledged that a job is in the light category when it requires a good deal of walking and standing, the ALJ did not discuss claimant's documented limitations in these exertional areas). "Because a failure to separately assess a claimant's capacity to perform the relevant strength demands can 'result in the adjudicator overlooking some of an individual's limitations or restrictions[,]' which can in turn 'lead to an incorrect use of an exertional category . . . and an erroneous finding that the individual is not disabled,' SSR 96-8p, 1996 WL 374184, at *4, this error is a further basis for remand." Ferguson, 2014 WL 3894487, at *8 (citing McClaney v. Astrue, No. 10-CV-5421(JG)(JO), 2012 WL 3777413, at *11 (E.D.N.Y. Aug. 10, 2012)).

**V.    Failure to Develop the Record (Plaintiff's Point V)**

Plaintiff contends that the second ALJ failed to develop the record in accordance with the Appeals Council's order inasmuch as he found that a "medical expert [was] not 'necessary' for a proper adjudication of the claim following remand." (T.48). As noted above, the Appeals Council had instructed the ALJ to obtain, "*if*

*necessary*, . . . evidence from a medical expert regarding medical improvement" of Plaintiff's impairments of degenerative disc disease and any impairments resulting from the 2008 MVA. Instead, the second ALJ ordered Plaintiff to undergo a second consultative examination by family practitioner Dr. Miller, who did not find medical improvement but noted some worsened clinical findings and issued a more restrictive RFC as compared to her 2010 report. However, as discussed above, the second ALJ rejected Dr. Miller's 2014 report in favor of her 2010 report for reasons that the Court found were unsupported by substantial evidence.

The phrasing of the Appeals Council's order appears to grant discretion to the ALJ as to whether or not to retain a medical expert. However, since the Court has found alternative bases for reversing the Commissioner's decision, it need not resolve whether the ALJ's decision not to retain a medical expert such as a neurosurgeon was reversible error.

Likewise, the Court need not consider whether the second ALJ's failure to subpoena the medical records from Plaintiff's no-fault insurance carrier (which the first ALJ had identified as relevant) was reversible error.

## REMEDY

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing. As discussed above, ALJ McDougall

committed multiple factual and legal errors in weighing the record evidence and the opinions provided by Plaintiff's treating physicians and the consultative physician, and cherry-picked the record in order to justify assigning the greatest weight to the least restrictive opinion, that is, consultative physician Dr. Miller's 2010 report. In the present case, the record is complete, and contains multiple functional assessments by individuals who have actually treated or examined Plaintiff.

The standard for directing a remand for calculation of benefits is met where the record persuasively demonstrates the claimant's disability, Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980), and there is no reason to conclude that the additional evidence might support the Commissioner's claim that the claimant is not disabled, Butts v. Barnhart, 388 F.3d 377, 385-86 (2d Cir. 2004). Upon reviewing the record in its entirety, the Court finds that had the opinions of Plaintiff's treating sources were accorded their proper weight, and if Dr. Miller's consultative opinions had been properly weighed rather than being based on the ALJ's selective parsing of the record, a finding of disability is compelled. Properly weighed, the opinions of Plaintiff's treating sources establish that Plaintiff cannot stoop, which erodes the sedentary occupational base; and cannot lift greater than 10 pounds, which precludes light work. Accordingly, the Court finds

that the matter should be remanded for calculation and payment of benefits.

## CONCLUSION

For the foregoing reasons, the Court finds that the Commissioner's decision was legally erroneous and is not supported by substantial evidence. It therefore is reversed. Accordingly, Defendant's motion for judgment on the pleadings is denied, and Plaintiff's motion for judgment on the pleadings is granted, and the case is remanded solely for the calculation and payment of benefits. The Clerk of Court is directed to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____

HON. MICHAEL A. TELESCA
United States District Judge

Dated:     March 7, 2018
           Rochester, New York.